UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 19-20093-CIV-MORENO

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, P.A.,

    Plaintiff,

vs.

VINARDELL POWER SYSTEMS, INC.,

    Defendant.
_____/

## ORDER ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

THIS CAUSE came before the Court upon the parties' cross-motions for partial summary judgment **(D.E. 27 & 39)**. THE COURT has considered the motions, the responses, and the replies, as well as argument presented by counsel at oral argument. Being otherwise fully advised, it is **ADJUDGED** that, for the reasons below, plaintiff's motion for partial summary judgment is **GRANTED**, and defendant's motion for partial summary judgment is **DENIED**.

## I. BACKGROUND

The instant case deals with the interpretation and application of a certain maritime insurance contract.[1] Plaintiff National Union Fire Insurance Company of Pittsburgh, P.A. ("National Union") seeks a declaratory judgment concerning whether certain equipment possibly damaged on the high seas was covered by a marine cargo insurance policy between it and the defendant Vinardell Power Systems, Inc. ("Vinardell"). National Union is a Pennsylvania

---

[1] For this reason, the Court has subject matter jurisdiction. *See Geico Ins. Co. v. Shackleford*, 945 F.3d 1135, 1139 (11th Cir. 2019) ("Marine insurance contracts qualify as maritime contracts, which *fall* within the admiralty jurisdiction of federal courts and are governed by maritime law.").

corporation with its principal place of business in New York. It is an insurer licensed and regulated by the State of Florida. Vinardell, meanwhile, is a Florida corporation with its principal place of business in Florida. It is an international distributor of electrical supplies.

Sometime in 2017, Vinardell contracted with FocusCargo, Inc., a freight forwarder, to facilitate the storage and transportation of twenty-five Siemens circuit breakers from Miami, Florida to Acajutla, El Salvador. Either before or while the circuit breakers were en route to El Salvador, twenty-three of them were damaged by water.[2] Vinardell had originally purchased the breakers to sell them to a customer "for an electrical infrastructure project in El Salvador."

Prior to shipping the breakers, Vinardell also purchased, through its shipping agent FocusCargo, marine cargo insurance from National Union's underwriting agent, Aktiv Assekuranz (USA), Inc. While contested, the insurance policy at issue is comprised of at least two documents: a two-page certificate of insurance (titled "Certificate (Policy) of Marine Insurance"),[3] and a much-longer master insurance policy (titled "MARINE OPEN CARGO POLICY NO. 15910854"). The certificate summarizes the kind of insurance purchased, explaining that the coverage was for "S.T.C. Electrical equipment," which would be provided "from warehouse to warehouse, in accordance with Clause 5 of the German General Rules of Marine Insurance, Special Conditions for Cargo." Below, the certificate has a section titled "Conditions," with an "x" mark immediately

---

[2] None of the parties, in their cross-motions for summary judgment, contest the fact that what primarily damaged the circuit breakers was water.

[3] A certificate of insurance is "a document evidencing that an insurance policy has been written and includes a statement of the coverage of the policy in general terms." *Certificate of Insurance*, BLACK'S LAW DICTIONARY (11th Ed. 2019). Federal and Florida courts typically hold that both the certificate and the master insurance policy form the terms of the insurance contract. *See, e.g., Perzy v. Intercargo Corp.*, 827 F. Supp. 1365, 1370 (N.D. Ill. 1993); *Rucks v. Old Republic Life Ins. Co.*, 345 So. 2d 795, 796 (Fla. 4th DCA 1977). As detailed later, since there were two separate shipments of the circuit breakers to El Salvador, there are two certificates for each shipment. For purposes of this Order, the certificates are treated one and the same as they are nearly identical in nature.

2

adjacent to the following relevant conditions: "German General Rules of Marine Insurance, Special Conditions for Cargo," "Form to cover (see overleaf): FULL COVER," and "Covering all risk from seller warehouse to buyer warehouse." On the overleaf, the certificate provides: "Full Cover (unless otherwise agreed)" and "Stranding Cover (where agreed)."

Relevant to the cross-motions for summary judgment at hand, the certificate summarizes full cover, detailing that "[t]he insurance covers irrespective of percentage, loss or damage to the goods insured as a consequence of a risk insured against." As for stranding cover, it is a specific type of insurance covering discrete forms of risk, including "stranding," "accident to another means of conveyance carrying the goods," "collapse of storage buildings," "natural catastrophes," "jettison, washing overboard or being lost overboard," "sacrifice of goods," and "discharge, intermediate storage and loading of the goods at a port of refuse on account of a risk insured against." The certificate lastly provides that "the risk attaches when goods are removed from the place of their last storage at the place of shipment for conveyance on the insured voyage."

As for the master insurance policy, it contains a "Schedule of Endorsements," where the first endorsement contains the German General Rules of Marine Insurance. Turning to those German Rules a few pages later, the policy provides that the German Rules form part of policy number 15910854, that full cover applies "unless otherwise agreed," and that stranding cover applies "where agreed." Next, clause 1 of the German Rules states that "[t]he insurance covers all risks to which the goods are exposed during the currency of the insurance." Later, in clause 1.3, titled "Special Cases," the policy contains an exclusion for "[d]eck cargo." The policy states that "[f]or goods loaded on deck with the consent of the Insured, Stranding cover only shall apply. Goods carried in closed containers or in barges carried by ocean-going vessels are insured on deck on the same conditions as in the hold." Like the certificate, the master policy provides, in clause

3

five of the German Rules, that "[t]he insurance attaches when the goods are removed from the place of their last storage at the place of shipment for conveyance on the insured voyage."

While the parties do not dispute the above provisions for the most part, they do dispute how twenty-three of the circuit breakers were damaged. Neither party contests the preliminary fact that, sometime in August 2017, the circuit breakers arrived at Miami Crating & Delivery, Inc. and that, upon arrival, Vinardell took title of the breakers. Both parties also agree that at the end of September 2017, the breakers were loaded onto nine open-top containers[4] at Miami Crating, and that there would be two separate shipments occurring in October 2017: one consisting of eight open-top containers containing twenty-two breakers, and another consisting of one open-top container containing the rest of the breakers. The parties even agree that the circuit breakers were placed on the deck of each ship for conveyance. But, both parties dispute what happened next. National Union contends, in numerous filings and in its original denial letter issued December 11, 2018, that rain from Hurricane Irma likely damaged the breakers as they sat outside Miami Crating in September 2017 awaiting shipment. Vinardell, meanwhile, argues that they were damaged en route to El Salvador. Upon review, evidence seems to support each theory.[5]

Regardless of how the breakers were ultimately damaged, the only issue now pending

---

[4] An open-top container is exactly as it sounds like: "a container with a floor and side walls but no roof that is often used for cargo which is too tall for the container, or over-height." *English Elec. Valve Co. v. M/V Hoegh Mallard*, 637 F. Supp. 1448, 1450 (S.D.N.Y. 1986), *abrogated on other grounds by* 81 F.2d 84 (2d Cir. 1987). Most likely, open-top containers were used in this case given the enormous size of the circuit breakers: each weighed approximately 7,800 pounds, with a height of approximately eleven feet.

[5] Specifically, National Union points to its expert on liability, James McCrory, who opines that rain from Hurricane Irma would have caused flooding and damage to the circuit breakers while they were stored in the parking lot at Miami Crating prior to shipment. National Union also relies on an expert meteorologist, Joseph Spain, who estimated that around twenty inches of rain would have fallen during that time. Vinardell disagrees, and contends that "[t]here has never been any flooding at Miami Crating." It relies on the deposition testimony of Eugenio Navarro, a part owner of Miami Crating, and *Emilio Garcia*, president of Vinardell, who claim to have inspected the circuit breakers right as they were being loaded into the open-top containers, and do not remember seeing water damage.

before the Court is what type of insurance coverage applies should the Court find, at trial, that the insurance policy attaches. The parties starkly disagree on whether full cover or stranding cover applies. In National Union's motion for partial summary judgment, it argues that stranding cover does, given that the contract contains an on deck, open-top container exclusion. Vinardell, meanwhile, disputes stranding cover, and argues in its respective motion that full cover applies. While Vinardell recognizes that the policy provides for stranding cover in certain circumstances, the rest of the policy, and relevant bill of lading,[6] provides for full cover.

Below, the Court details the parties' motions for partial summary judgment, and ultimately finds, based on a plain reading of the insurance policy, that stranding cover applies to the circuit breakers at issue (should it be later found at trial that the insurance policy does, in fact, attach).

## II. THE CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### A. Summary Judgment Standard

"Summary judgment pursuant to [Federal Rule of Civil Procedure] 56[a] is appropriate when there exists no genuine issue as to any material fact and a decision may be rendered as a matter of law." *Howard v. BP Oil Co.*, 32 F.3d 520, 524 (11th Cir. 1994). Relevant to the issue before the Court, "summary judgment is an appropriate vehicle for interpretation of an insurance contract as a question of law." *Max Specialty Ins. Co. v. A Clear Title & Escrow Exch., LLC*, 114 F. Supp. 3d 1191, 1194 (M.D. Fla. 2013) (citing *Tech. Coating Applicators, Inc. v. U.S. Fid. & Guar., Co.*, 157 F.3d 843, 844 (11th Cir. 1998)). "The policy, however, must contain clear and unambiguous wording to resolve the issue as a matter of law." *Id.* at 1194-95.

---

[6] A bill of lading is a "[a] document acknowledging the receipt of goods by a carrier or by the shipper's agent and the contract for the transportation of those goods; a document that indicates the receipt of goods for shipment and that is issued by a person engaged in the business of transporting or forwarding goods." *Bill of Lading*, BLACK'S LAW DICTIONARY (11th ed. 2019). Just as there are two certificates of insurance due to the separate shipments of the open-top containers, there are two bills of lading. The bills of lading are also treated as one and the same given that they are substantially similar in content.

## B. Analysis

In its motion for partial summary judgment, National Union contends that the unambiguous language of the insurance policy provides that only stranding cover applies to the damaged circuit breakers. It points to a part of the master insurance policy that includes the "German General Rules of Marine Insurance." Clause 1.3 of those rules, titled "Special Cases" provides in full that "[f]or goods loaded on deck with the consent of the Insured, Stranding Cover only shall apply. Goods carried in closed containers or in barges carried by ocean-going vessels are insured on deck on the same conditions as in the hold." Here, because there is no dispute that the circuit breakers were stored in open-top containers, stranding cover applies. National Union also points to the bill of lading that was issued. There, the bill notes that the subject shipment was not "containerized." The fact was further confirmed by Vinardell's president, Emilio Garcia, who agreed that the breakers "were loaded into the open top containers." National Union also includes a picture obtained in discovery showing the circuit breakers aboard the ship in open-top containers.

Vinardell, in its motion for partial summary judgment, disagrees with National Union's contention that the insurance policy at issue provides for stranding cover.[7] It agrees that the policy is unambiguous, but for the opposite result: providing full cover. First, it points to the plain representation on the first page of the certificate of insurance, stating: "Forms to cover (see overleaf): FULL COVER." Then, lower on that same page, it points to the phrase "[c]overing all risk from seller warehouse to buyer warehouse." This last sentence, Vinardell argues, is particularly compelling as National Union, in email correspondence, explicitly agreed to include it in the certificate of insurance as the parties were contracting. Vinardell then points to the

---

[7] Since Vinardell in its motion for partial summary judgment largely rehashes many of the same arguments that it makes in response to National Union's respective motion, for purposes *of brevity*, this Order only recounts the arguments made in Vinardell's motion for partial summary judgment.

overleaf of the certificate of insurance, where the certificate states that the contract would be for "Full Cover (unless otherwise agreed)." Vinardell next argues that the master insurance policy (and its German Rules) do not form the terms of the relevant insurance policy as they were not incorporated by the certificate. Instead, the certificate only incorporates the relevant bill of lading, which also makes clear that the type of coverage provided was full. Since the certificate incorporates the bill of lading, which in turn stated that the cargo was stored in open-top containers, "[t]his fact alone precludes Plaintiff's theory for declination of coverage." Concluding, Vinardell contends that if the Court does not find the policy unambiguous in its favor, it at least find the policy ambiguous—in which case the policy should be construed in its favor as the insured.

Ultimately, the Court finds that after review of the applicable insurance policy, stranding cover applies to the circuit breakers. As a preliminary matter, federal courts routinely apply Florida law to govern the manner of interpretation of a maritime contract. *See Geico Marine Ins. Co. v. Shackleford*, 945 F.3d 1135, 1139-40 (11th Cir. 2019) (applying Florida law to interpret a maritime insurance contract). "Under Florida law, we first look to the text of the policy to construe the policy 'in accordance with [its] plain language.'" *Id.* (alteration in original) (quoting *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003)). Furthermore, "in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) (citing *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 941 (Fla. 1979)). "[I]f the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the another limiting coverage, the insurance policy is considered ambiguous." *Id.* Such an ambiguous policy is "interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy." *Id.* However, "[o]nly when a

7

genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to ordinary rules of construction is the rule apposite." *Swire*, 845 So. 2d at 165 (alteration in original) (quoting *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla. 1986)).

Here, looking to the text of the policy and reading the policy as a whole, and endeavoring to give each provision of the policy its full meaning and operative effect, the Court concludes that the contract signed between the parties initially provides for full cover—but that certain exclusions apply in certain circumstances. The text of the maritime insurance policy makes this evident. The certificate literally states that as a condition of the policy, the German Rules would apply (as marked by an "x"). Further supporting that the rules apply is the specific mention that "insurance has been granted under the above Open Cover [No. 015910854]" (which is the master policy containing the German Rules), and statement that the insurance would cover the cargo "in accordance with Clause 5 of the German General Rules." As for the German Rules themselves, they specifically include the on deck, open-top container exclusion in clause 1.3. Reading the entire exclusionary clause makes clear that open-top containers placed on deck are afforded stranding cover, while all other cargo stored in closed containers is afforded full cover.

There is no ambiguity, as the insurance policy in this case is no different than any homeowner's insurance contract in Florida that provides for "all-risk" coverage. Such contracts, on their face, state that they cover all risks, but then, elsewhere in the same contract, contain "exclusionary" provisions for specific perils not subject to coverage. *See, e.g., Jones v. Federated Nat'l Ins. Co.*, 235 So. 3d 936, 940-41 (Fla. 4th DCA 2018). In *Fayad v. Clarendon National Insurance Co.*, 899 So. 2d 1082 (Fla. 2005), the Florida Supreme Court all but recognized this structural layout of an all-risk homeowner's policy. *Id.* at 1085-86. While the court noted that an all-risk policy might seem to provide, on its face, coverage for all perils, "an 'all-risk' policy is not

8

an 'all loss' policy, and thus does not extend coverage for every conceivable loss." *Id.* at 1086. The reason, the Court explained, was because such policies "expressly exclude[] [certain] loss from coverage." *Id.* at 1085. *See also Mejia v. Citizens Prop. Ins. Corp.*, 161 So. 3d 576, 580 (Fla 2d DCA 2014) (Altenbernd, J., concurring) (recognizing that all-risk insurance policies are never actually construed in Florida as all-risk policies "if one defines 'all risks' literally").

The same is true here. While the certificate of insurance, as Vinardell contends, does state that "FULL COVER" applies, in the line before (thus, in the very first operative line of the certificate of insurance), the certificate states that the "German General Rules of Marine Insurance" also apply. There is a mark (an "x") immediately next to those rules showing that the parties agreed they would apply. And, besides these German Rules being incorporated in the certificate of insurance itself, the rules are explicitly included in the master policy of insurance. Akin to the all-risk homeowner's insurance policy discussed above, the German Rules begin by stating that the insurance at issue was full cover: "The insurance covers all risks to which the goods are exposed during the currency of the insurance." However, in clause 1.3, titled "Special Cases," exclusions are found—which are not subject to full cover. Specifically, the contract provides, in relevant part, that "[f]or goods loaded on deck with the consent of the Insured, Stranding Cover only shall apply." Vinardell zealously argues that it never agreed to application of stranding cover to its cargo that was loaded on deck. It points to the certificate of insurance, which states that stranding cover only applies "where agreed." While true, Vinardell's arguments are vitiated by the same certificate of insurance it relies on to make its argument. Again, the "x" mark next to the German Rules shows that both parties agreed to stranding cover in certain situations.

While no case is on point, federal and Florida courts generally recognize that like in the homeowner's insurance context, all-risk maritime insurance policies cover all risks subject to the

terms and conditions of the policy. For instance, in *Great Lakes Reinsurance (UK) PLC v. Kan-Do, Inc.*, 639 F. App'x 599 (11th Cir. 2016), the Eleventh Circuit wrote that, "[i]n broad terms, all-risk [maritime] insurance policies cover all 'fortuitous' losses, 'unless the policy contains a specific provision expressly excluding the loss from coverage.'" *Id.* at 601 (quoting *Dow Chem. Co. v. Royal Indem. Co.*, 635 F.2d 379, 386 (5th Cir. 1981)). The court went on to explain that typically, "[o]nce the insured meets the light burden of establishing that a loss occurred due to some fortuitous event or circumstance, the burden shifts to the insurer to show that the loss is excluded by some language set out in the policy." *Id.* Here, while Vinardell carries its initial burden of demonstrating there was a loss, National Union has satisfied its respective burden by pointing to the existence of the open-top container exclusion in clause 1.3 of the German Rules. Florida courts interpret all-risk maritime contracts the same way. *See, e.g., B & S Assocs., Inc. v. Indem. Cas. & Prop., Ltd.*, 641 So. 2d 436, 437 (Fla. 4th DCA 1994) ("Once the insured establishes a loss apparently within the terms of an all-risk [maritime] policy, the burden shifts to the insurer to prove that the loss arose from a cause which is excepted." (quoting *Hudson v. Prudential Prop. & Cas. Ins. Co.*, 450 So. 2d 565, 568 (Fla. 2d DCA 1984)).

The uncanny resemblance between this maritime cargo insurance contract and that of a homeowner's all-risk insurance contract cannot be overstated. The certificate and German Rules both directly use the words "all risk" just like in a homeowner's insurance contract. The fact that both the certificate of insurance (stating in one section it provides full cover, then in another section that the German Rules apply), and the German Rules themselves (stating in one section that full cover applies, then in another section that stranding cover applies for on deck, open-top containers) are structured similarly—consistent with the form of an all-risk homeowner's insurance contract— illustrates that the parties intended for the policy to be an all-risk one, subject to certain exclusions

10

(i.e., the open-top container provision). Lending further credence to the parties' intent is the fact that all-risk maritime insurance contracts are indeed interpreted by federal and Florida courts to generally cover all risks, except those subject to the terms and conditions of the policies.

In sum, the cumulative effect of reading both the certificate and master policy in *pari materia,* in such a way as to give each provision of the insurance policy its full meaning and operative effect, leads to the ineluctable conclusion that the parties' sought to have full cover apply for all cargo on board except for cargo specifically loaded on deck in open-top containers. In interpreting the provisions this way, the Court need not read the open-top container exclusion (and with it, the German Rules) out of the policy. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167-69, 174-79 (2012) (discussing the whole-text canon, which requires considering "the entire text, in view of its structure and of the physical and logical relation of its many parts," and the rule against surplusage, which requires that "every word and every provision . . . be given effect"); *accord Geico Marine Ins.*, 945 F.3d at 1141.

As a final note, Vinardell spends much of its time arguing that only the certificate of insurance and relevant bill of lading form the insurance policy at issue. Those arguments are misplaced. The certificate only incorporates the master policy (which, in turn, contains the German Rules) by specifically stating that "insurance has been granted under the above Open Cover." Looking above, the open cover number provided ("015910854") corresponds to the master policy (titled: "MARINE OPEN CARGO POLICY NO. 15910854"). As such, the certificate not only references the master policy, but also shows the parties' clear intent to be bound by its terms. *See Microsoft Corp. v. Big Boy Distribution LLC*, 589 F. Supp. 2d 1308, 1319 (S.D. Fla. 2008) ("A document may be incorporated by reference in a contract if the contract specifically describes the document and expresses the parties' intent to be bound by its terms.").

But, while the certificate incorporates the master policy, it does not incorporate the relevant bill of lading. The reason is because the certificate only references the bill in passing (merely citing to the bill by providing the cargo's booking/document number) and details nothing about the parties' intent to bind themselves to the terms of the bill. "[T]he doctrine [of incorporation by reference] requires that there must be some expression in the incorporating document . . . of an intention to be bound by the collateral document. . . . A mere reference to another document is not sufficient to incorporate that other document into a contract, particularly where the incorporating document makes no specific reference that it is 'subject to' the collateral document." *Temple Emanu-El of Greater Fort Lauderdale v. Tremarco Indus., Inc.*, 705 So. 2d 983, 984 (Fla. 4th DCA 1998) (second, third, and fourth alterations in original) (quoting *Kantner v. Boutin*, 624 So. 2d 779, 781 (Fla. 4th DCA 1993)). Regardless, the Court finds the analysis a mostly futile exercise. Even if the bill were somehow incorporated into the insurance policy, nothing in the bill seems to speak to the type of insurance provided to the cargo on board.

## III. CONCLUSION

Based on the foregoing, National Union's motion for partial summary judgment is **GRANTED**, and Vinardell's respective motion is **DENIED**. Reading the policy as a whole and endeavoring to give each provision its full meaning and operative effect, the instant maritime insurance contract is an all-risk one containing an on deck, open-top container exclusion. The policy is not ambiguous just because it may seem, at first glance, that the terms full cover and stranding cover are mutually exclusive. Instead, the policy purposefully includes both terms as it is modeled like an all-risk homeowner's insurance contract (where the policy may state in one section that it is an all-risk one, but state in a separate section that certain exclusions apply). That both the certificate and master policy (which form the entirety of the subject insurance policy) are

12

similarly structured in this way reinforces the Court's holding, and shows that the use of both types of coverage was not a mutual mistake, but rather the parties' deliberate intent to have full cover apply to all cargo except that which was loaded on deck in open-top containers.

Having found that stranding cover applies, the case proceeds to trial. A genuine issue of material fact remains concerning *when* the circuit breakers were damaged. Determination of this issue will decide whether the insurance policy attaches to the breakers in the first instance, as the certificate and master policy provide that coverage attaches when the goods "are removed from the place of their last storage at the place of shipment for conveyance on the insured voyage."

DONE AND ORDERED in Chambers at Miami, Florida, this ___19___ of March 2020.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record